NOTICE

Decision filed 08/09/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190386-U

NO. 5-19-0386

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 15-CF-98 |
| | ) | |
| RODNEY E. BLACK, | ) | Honorable |
| | ) | Walden E. Morris, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court erred where it did not admonish the defendant under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) to determine whether the defendant was able to make a knowing and intelligent waiver of his right to counsel after the defendant made a clear and unequivocal request for self-representation. The trial court did not abuse its discretion by denying the defendant's motion for change of venue.

¶ 2    The defendant, Rodney E. Black, was found guilty of first degree murder and intentional homicide of an unborn child after a jury trial. He appeals (1) the denial of his right to represent himself; (2) the denial of his motion to change venue based on the racial composition of the jury pool; (3) whether he was denied due process of law because Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) is facially unconstitutional; (4) whether he received ineffective assistance of trial counsel; (5) whether the State failed to prove beyond a reasonable doubt that the defendant caused the death of the victim's unborn child; and (6) the imposition of a mandatory natural life

1

sentence for first degree murder and intentional homicide of an unborn child. For the following reasons, we reverse the judgment of conviction and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4     On April 17, 2015, Latisha Reidelberger died after being stabbed multiple times. Latisha was approximately 13 weeks pregnant, and her unborn child did not survive the incident. At the time of the offense, the defendant was in a dating relationship with Latisha, and they had three children together. When Latisha was stabbed, she was at home with the defendant and their two sons. Their daughter was playing outside nearby.

¶ 5     On April 20, 2015, the defendant was charged with three counts of first degree murder and three counts of intentional homicide of an unborn child. The day after the charges were filed, the defendant was advised of his rights, the nature of the charges, and the possible penalties. Lowell Tison was appointed to represent the defendant.

¶ 6     The defendant appeared in court on May 14, 2015, with Tison. The defendant pled not guilty, and a jury trial was requested. Thereafter, the defendant appeared with Tison for multiple pretrial settings.

¶ 7     On August 28, 2015, the defendant filed a motion to represent himself. The defendant claimed that Tison had urged the defendant to take a plea agreement before reviewing discovery, that the defendant had not received discovery documents, and that his attorney had not filed any motions on his behalf.

¶ 8     On September 25, 2015, the trial court addressed the defendant's motion to represent himself. The defendant expressed that he had not been provided with printed discovery documents to review. He also indicated that he was frustrated with Tison for not meeting with the defendant as often as he would like to discuss case strategy. The defendant stated, "I feel that I can better

represent myself." Tison responded that he had used his laptop to allow the defendant to review the documents received, and discovery had not been completed. The court stated that the defendant had the right to represent himself but asked the defendant whether he wanted to resolve the discovery matter with his attorney. The defendant responded that he would feel better if he was able to review discovery and determine his options. The court told the defendant that if it came to a point where he wanted to represent himself, he had that right. The court then set the matter for another pretrial hearing.

¶ 9     On October 9, 2015, Tison reported to the court that the defendant had reviewed printed discovery documents, but they had not met to discuss the case. The defendant reported to the court that he was still unhappy with Tison's representation. The defendant asked to represent himself and to amend his plea to "not guilty by reason of insanity." The defendant informed the court that he had filed a complaint with the Attorney Registration and Disciplinary Commission (ARDC) the week prior to the hearing date. Tison was unaware of an ARDC complaint. The court set a new hearing date to address the potential conflict of interest and to determine whether the defendant wished to represent himself or have a different attorney represent him.

¶ 10     On October 19, 2015, Tison filed a motion to withdraw as the defendant's attorney. The basis for the withdrawal was the ARDC complaint filed by the defendant.

¶ 11     On October 23, 2015, the defendant appeared with Tison on counsel's motion to withdraw. Tison argued that the ARDC complaint created a conflict of interest and he wished to withdraw as counsel. The defendant did not object to Tison's motion. The court asked the defendant whether he wanted to represent himself or have another attorney appointed. The defendant chose to be represented by counsel. The defendant had two additional, unrelated, matters pending where

3

Nathan Rowland was the defendant's appointed attorney. The court appointed Rowland to represent the defendant in this matter, as well.

¶ 12    After Rowland was appointed, multiple pretrial settings were held. The parties continued to obtain discovery, including medical records. Then, on November 29, 2016, the defendant filed a motion entitled "Withdraw Counsel." He alleged that Rowland had previously represented the defendant in 2007, and he was found guilty. An appeal was filed in the previous matter where Rowland was the defendant's trial attorney. See *People v. Black*, 2011 IL App (5th) 080089. The defendant also alleged that Rowland was not communicating and had not discussed discovery with the defendant. The defendant requested that the court grant the motion to remove counsel, without including a specific prayer for relief.

¶ 13    On January 17, 2017, the trial court heard the defendant's motion to remove counsel. The defendant read his motion to the court. The defendant then informed the court that Rowland had been removed as the defendant's counsel on the two other matters that were pending. The defendant claimed that he had filed a complaint with the ARDC against Rowland. The defendant additionally accused Rowland of releasing confidential information by discussing his case in front of two deputies who were witnesses in a case against him.

¶ 14    During the January 17, 2017, hearing, Rowland confirmed that another attorney had been appointed to represent the defendant in the two other, unrelated matters, that were pending. Discovery had not been completed in this case and the trial had not been scheduled. Rowland denied discussing confidential information about the defendant with sheriff's deputies and informed the court that he had met with the defendant during several court appearances.

¶ 15    The trial court stated that it had considered the defendant's motion and reviewed the court file with the dates the defendant had been in court with Rowland. The court then stated, "the court

having considered the statements of [the defendant], those of Mr. Rowland, finds the defendant's motion for the dismissal of Attorney Rowland should be and therefore is granted." The court then informed the defendant that he was free to hire an attorney. The defendant asked if the court would appoint an attorney for him. The court then stated, "that motion is denied," and the trial court moved on to discuss the trial setting. Rowland then inquired if he was withdrawing from the case, and the court said, "no."[1]

¶ 16    The defendant asked the court on what grounds his motion was denied. The court explained that the defendant had already been assigned a public defender, and Rowland was providing adequate representation. The court further stated that the defendant did not get to "pick a lawyer." Before the court finished its explanation, the defendant interjected, and the following statements were made:

> "THE DEFENDANT: Well, I'll represent myself.
> THE COURT: —this Court's review of this file and what—
> THE DEFENDANT: I'll represent myself.
> THE COURT: —Mr. Rowland has told me that—
> THE DEFENDANT: I will represent myself then.
> THE COURT: —you are receiving competent counsel.
> THE DEFENDANT: I will represent myself. I am not taking Nathan Rowland as a lawyer.
> THE COURT: Whose motion was it to set this for a pretrial on March the 21st?
> [THE STATE]: Mr. Rowland's.
> MR. ROWLAND: That's correct, Judge.
> THE COURT: That motion will be granted.
> THE DEFENDANT: I'll represent myself. I want a motion to represent myself, open.
> THE COURT: File any motions you want to file, Mr. Black.
> THE DEFENDANT: I just filed it.
> THE COURT: We'll take them up.
> THE DEFENDANT: Open in court.
> THE COURT: File any motions you want.
> THE DEFENDANT: I'll represent myself. I'm not taking Nathan Rowland as a lawyer.
> THE COURT: Well, we will deal with that at the next hearing.
> THE DEFENDANT: Okay.

[1]According to the report of proceedings, the trial court originally allowed the motion for Rowland to withdraw. For reasons that are not clear from the record, the trial court then indicated that Rowland could not withdraw as counsel for the defendant.

5

THE COURT: File your motion.
THE DEFENDANT: We're done?
THE COURT: That's up to you. Do you have anything else you want to say?
THE DEFENDANT: (No response.)"

¶ 17    The next pretrial hearing took place on March 21, 2017. The State informed the court that it was ready to proceed with trial. Rowland asked for an additional pretrial hearing because he was still attempting to obtain various medical records and the results from a DNA test. The defendant informed the court that there were four DVDs of discovery that he had not seen. The court asked Rowland to meet with the defendant to review the DVDs. The court then asked the defendant, "Anything else, sir, today?" The defendant responded, "That's it." The defendant's prior request for self-representation was not addressed.

¶ 18    On May 2, 2017, another pretrial hearing took place. During this hearing, the defendant informed the court that Rowland still had not met with him to review discovery. Rowland confirmed that to be true. The court asked the defendant to inform the court if Rowland did not meet with the defendant prior to May 30, 2017. The record does not contain any further complaints until February 2019.

¶ 19    On February 27, 2019, the defendant filed a letter with the court where he complained again about his attorney. The defendant claimed that Rowland had only met with him on a few occasions. Rowland reviewed discovery material with the defendant two days before the trial date. The defendant in his letter stated, "this is the attorney you forced me to go to trial with."

¶ 20    During a pretrial setting on February 27, 2019, the defendant asked the court for a change of venue from Saline County due to the short jury deliberation time in his other matter. The court responded that it would consider any motion that the defendant filed. The defendant responded that he made an oral motion. The court then directed the defendant to speak to Rowland about filing a motion for change of venue.

¶ 21    On April 8, 2019, before the jury selection began, the defense filed and argued a motion for change of place of trial. The defense claimed that there had been significant media coverage regarding this matter and that the jury pool in Saline County would be unduly prejudiced against the defendant. The State argued that the news media had only announced the date the trial was scheduled to begin, but there was no in-depth coverage of the incident. The court took the motion under advisement and stated that it was unable to rule on the motion until determining the extent of the potential juror's knowledge through *voir dire*.

¶ 22    The parties then questioned the prospective jurors. During a recess, the defense raised a motion regarding jury composition. The court took judicial notice that there were no African American individuals within the venire. After the selection of four jurors, the defense argued its motion objecting to the jury composition. The defendant noted that the population of Saline County was comprised of 3.9% African Americans and there were no African Americans in the venire. Additionally, the victim in this case was Caucasian. The defense argued that a racially balanced venire should be selected, or the venue of the trial should be changed.

¶ 23    The State argued that it was the defendant's burden to prove that the jury panel was improperly selected. To make a *prima facie* violation of the requirement that the jury be drawn from a fair cross-section of the community, the defendant must show that the group alleged to be excluded is a distinct group in the community; the representation of the group is not fair and reasonable in relation to the number of such persons in the community; and the underrepresentation is due to systematic exclusion of the group in the jury selection process. The State claimed that the defendant failed to prove that the representation was not fair and reasonable or that the underrepresentation was due to systematic exclusion.

7

¶ 24    The parties discussed the population of Saline County. Statistically, there should have been three African American individuals in the 61-person venire. The defense argued that the defendant had a trial earlier in the year[2] without an African American individual in the venire and that the jury selection process in Saline County systematically fails to include persons of color.

¶ 25    Lisa Lane, the jury commissioner for Saline County, testified during the motion hearing. Ms. Lane had been the jury commissioner for 17 years and she testified to the process of selecting potential jurors. She explained that the commission receives an annual list of people who are registered to vote or have a driver's license with Saline County as their residence. The data is uploaded into a computer program. The commission meets monthly and uses the computer program to print out a list of 300 random people to be chosen as potential jurors. After the list is printed, the commission reviews the list to determine if anyone on the list has passed away, moved, or is unable to appear due to health reasons. The commission then prints out a summons to mail to potential jurors. In this case, 175 summons were sent out and 61 people appeared. The commission is not aware of the racial makeup of potential jurors when it prints the random list of potential jurors. Lane was not aware of any way to tamper with the system to exclude certain races from potentially serving on a jury.

¶ 26    The trial court found that the underrepresentation of African Americans in the venire was not unfair or unreasonable in relation to the number of people in Saline County, Illinois. The underrepresentation was not due to systematic exclusion of African Americans in the jury selection process in Saline County. The court denied the defendant's motion.

¶ 27    After jury selection resumed and concluded, the court addressed the defendant's motion for change of venue that it had previously taken under advisement. The defense argued that most

---

[2]This trial was not related to the incident involving Latisha Reidelberger.

of the jurors were aware of this case from watching or reading the news, Facebook pages, or through conversations. The defense had made motions to remove jurors who had knowledge of the case; however, not all of the motions for cause were granted. The defense argued that the collective information known by the jurors about this case would cause undue prejudice to the defendant. A change in venue to a location with less publicity on this case was requested. The State argued that selected jurors who had heard something about the case indicated that they could be fair and had not yet formed an opinion regarding the case. The court denied the motion for change of venue.

¶ 28    The jury trial began on April 9, 2019. Vickie Woods, Latisha's mother, testified. Woods testified to a conversation in March of 2015, while the defendant, Latisha, and their children were visiting Woods at her home. Latisha announced that she was pregnant. The defendant was present for this conversation. Woods also testified to events that occurred on April 17, 2015. Woods received a telephone call that her daughter was injured. Woods then drove to Latisha's home and picked up her grandchildren. They drove to Ferrell Hospital and learned that Latisha had passed away at the hospital.

¶ 29    The three children of Latisha and the defendant each testified to what they knew about the incident on April 17, 2015. Their son, M.B., testified that he was watching television with his brother, R.B. His parents were home and arguing. Latisha went upstairs and the defendant followed. M.B. remembered that he heard his mother start screaming and she ran downstairs covered in blood. Then, the defendant came downstairs and had blood on his shirt.

¶ 30    R.B. also testified that he was watching television with his brother on April 17, 2015. He was not listening to his mother and father because he was paying attention to the television. He recalled that his mother and the defendant walked through the living area to go upstairs. He heard

9

his mother scream, "he's killing me." R.B. saw his mother breathing hard, but he did not notice any wounds. R.B. testified that the defendant "walked straight out" of their home. R.B. did not notice if the defendant had blood on his clothes. R.B. went to the playground to find his sister and told her that their mother was hurt. He did not go back inside his apartment because someone had ushered R.B. into their apartment.

¶ 31 S.B., the defendant's daughter, testified that on April 16, 2015, she found out that her mother was pregnant. The defendant was present for that conversation. On April 17, 2015, S.B. was outside on the playground while her brothers were watching a movie. S.B. came back inside the apartment to drink a glass of water. Her mother was doing the dishes while the defendant sat in the kitchen. S.B. quickly left because the defendant looked angry. Approximately 15 to 20 minutes after S.B. went back to the playground, her brother, R.B., came to find her. S.B. returned home and stood outside by the defendant for a short period of time until the defendant went inside the apartment to get his medicine. S.B. testified that her mother was covered in blood with cuts on her arms and chest. She was able to speak with her mother before her mother was placed in the ambulance. Her mother told S.B. that she was dying and loved her and her brothers.

¶ 32 Kenneth Griffin then testified. Griffin was the maintenance director and the assistant executive director for the Saline County Housing Authority. Griffin had been helping staff change lightbulbs at the housing complex on the day of April 17, 2015. Griffin heard a voice scream, "quit stabbing me, you're going to kill me." Griffin barged through the door of Latisha's apartment and ran up the stairs. Latisha had fallen to the floor, and she was bloody and was calling out for help. Griffin also saw the defendant standing there with a blank look on his face and blood on a bandaged arm. The defendant left the apartment and Griffin followed while he called the police. Griffin also told two women who were standing outside of the apartment to assist Latisha while he kept his

eye on the defendant. Griffin believed that Latisha had been beaten up. He did not realize that she had been stabbed. The women moved Latisha downstairs to the foot of the steps and yelled to Griffin for help. Griffin returned and noticed the several stab wounds. Latisha appeared to be in shock and was turning blue. Griffin called the police department again to request an ambulance to be dispatched immediately. Griffin testified that at some point before emergency assistance arrived, the defendant tried to go back inside the apartment to get his heart medicine. Griffin told him not to go in and the defendant backed away. The defendant tried again to go inside the apartment, and a woman blocked him from going inside. Griffin then allowed the defendant to go inside because the defendant started to get combative. Griffin testified that the defendant was on the sidewalk outside of Luther Coleman's apartment when the police arrived. The police then took the defendant into custody.

¶ 33    Andrea Simmons also testified. Simmons was visiting her niece at the apartment complex on April 17, 2015, where the incident occurred. Simmons testified that she heard screaming and saw Griffin enter the apartment next to the unit where her niece stayed. Simmons instructed her niece to call 911 and then went to aid Latisha who was lying in the doorway of her apartment. Simmons testified that she attempted to put pressure on the stab wounds located on Latisha's chest and arm. Latisha kept repeating that she could not breathe and said, "he did it, he stabbed me." Simmons testified that the defendant stepped over Latisha to go into the apartment while Simmons tried to help stop the bleeding.

¶ 34    Clint Hooper, a police officer with the Eldorado Police Department, testified that after he arrived, he spoke to Griffin, who informed the officer that it was the defendant who had stabbed Latisha. Hooper asked Griffin where he could locate the defendant and Griffin identified the defendant for Hooper. At the time, the defendant was standing next to Luther Coleman, another

11

resident of the apartment complex. Hooper gave the defendant the order to get on the ground and the defendant complied with the command. Hooper then advised Coleman to back away. When Hooper arrested the defendant, he noticed blood on the defendant's shirt and blood on a bandage located on one of the defendant's hands. Hooper did not find a weapon when the defendant was arrested. Once the defendant was arrested, Hooper had the ambulance attend to Latisha. Hooper then secured Latisha's apartment to see if anyone else was inside and subsequently posted caution tape. The Illinois State Police were called to investigate the crime scene.

¶ 35    Luther Coleman testified about his interactions with the defendant on April 17, 2015. The defendant knocked on Coleman's door that afternoon. When Coleman answered, he noticed that the defendant had blood on his shirt and on his bandaged arm, which Coleman referred to as a cast. He described the defendant's relationship with Latisha as volatile and believed they had been in another fight. The defendant gave a knife and the keys to his truck to Coleman. Coleman testified that he was instructed by the defendant to hold onto the knife because the defendant was a felon, and he did not want any charges brought against him. Coleman put the keys and knife under his couch. Coleman was interviewed twice by state troopers and lied about the knife during both interviews. The morning after the incident, law enforcement officials were outside of Coleman's apartment searching for the weapon. Coleman testified that he took the knife outside, set it by a gutter, and told an officer that he found it. During a third interview with law enforcement, Coleman explained that the defendant brought him the keys and the knife after the incident. Coleman testified that he did not tamper with the knife.

¶ 36    Dr. John Heidingsfelder testified as an expert in the field of forensic pathology. Heidingsfelder explained that he examined Latisha's body and documented 10 stab wounds to the outside of her body before performing an internal examination. On his internal examination,

12

Heidingsfelder observed a large amount of blood in the left side of the chest between the left lung and left chest wall. Heidingsfelder explained that the right ventricle of Latisha's heart had been stabbed. When the knife went through the sac around her heart it had nicked Latisha's left lung. He believed that the blood accumulation in her left chest was due to the heart wound. Heidingsfelder testified that Latisha's immediate cause of death was due to the internal bleeding in the left chest.

¶ 37   Heidingsfelder also testified that he sent a blood sample for a toxicology screen to a forensic laboratory. The toxicology report showed that Latisha had methamphetamine, diazepam, nor-diazepam, THC, naproxen, and methylphenidate in her system at the time of her death. Heidingsfelder testified that regardless of the stimulants in Latisha's system, the cause of death was from the stab wounds.

¶ 38   During the autopsy, Heidingsfelder also determined that Latisha was approximately 13 weeks pregnant. The fetus did not sustain direct injuries from the knife when Latisha was stabbed. Although there was no direct trauma to the fetus, Heidingsfelder explained that when the mother's blood stopped circulating, she no longer oxygenated the fetus, which caused the fetus to die *in utero*. Heidingsfelder explained that when a fetus dies *in utero* while a mother is alive, the skin surface of the fetus breaks down within three to six hours after death. There was no evidence of skin breakdown, suggesting that the death to the fetus occurred after the mother had died. Heidingsfelder also stated that the drugs in the mother's system would have had a long-term negative impact on the fetus. Photographs of the autopsy were admitted into evidence when Heidingsfelder testified.

¶ 39   Brian Hapack, with the Illinois State Police forensic science lab, also testified. Hapack was a forensic biology DNA analyst. The court found that Hapack was an expert in the aspects of DNA

13

analysis. Hapack opined that the blood found on the defendant's shirt, hands, and the blade of the knife belonged to Latisha. Hapack also testified that the handle of the knife contained a mixture of three DNA profiles, but a determination of who contributed to those profiles could not be made. The defendant was not identified in any of the DNA samples.

¶ 40    After the State rested, the defense moved for a directed verdict. The court denied the motion. The court then informed the defendant of his right to testify, and he chose not to testify. The defense did not present additional evidence or witnesses.

¶ 41    During closing argument, the defense did not make any specific arguments regarding the three counts of intentional homicide of an unborn child. After the jury deliberated, the jury returned a verdict of guilty on all counts.

¶ 42    On May 14, 2019, the parties argued the defendant's motion for a new trial. The defense argued five issues, including: that no reasonable jury could find, beyond a reasonable doubt, that the defendant committed the alleged offenses and requested a directed verdict in favor of the defendant; the venire lack a fair racial cross-section; and the admission of photographs from the autopsy were unnecessary, gruesome, and were not relevant to the actual offense. The defense also requested a new trial at a different venue. The court denied the motion for new trial.

¶ 43    After denying the motion for new trial, the court proceeded to a sentencing hearing. The State proposed that the defendant was subject to a mandatory natural life sentence. The State argued the applicability of section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2018)), wherein the court was obligated to sentence the defendant to a natural life sentence because the defendant had been found guilty of murdering more than one victim. Because both Latisha and her unborn child had died, two deaths had occurred. The defense argued that the unborn infant homicide statute is not, by definition, a murder; therefore, the natural

14

life requirement for murders under the sentencing code should not apply. The defense proposed that the defendant should be sentenced to 20 years in regard to Latisha, and a 20-year sentence regarding the homicide of an infant, with the terms to be served concurrently. The court sentenced the defendant to a term of natural life in prison.

¶ 44     On August 13, 2019, a hearing on the defendant's motion to reduce sentence was heard. The defense argued that to be sentenced to natural life in prison requires being found guilty of murdering more than one victim. Homicide of an unborn child and murder are not the same under the statute. The defense requested that the court reconsider the defendant's sentence. The State argued that the facts in this case were similar to those in *People v. Shoultz*, 289 Ill. App. 3d 392 (1997), wherein a defendant was convicted of first degree murder and intentional homicide of an unborn child and was sentenced to natural life in prison. The court found that it was bound to follow the holding in *Shoultz* and denied the defendant's motion for a reduction in sentence. This appeal followed.

¶ 45                                    II. ANALYSIS

¶ 46     The defendant raises multiple issues on appeal. The defendant claims: (1) the trial court abused its discretion by denying the defendant the right to represent himself; (2) his sixth amendment right to a fair trial was violated where the venire from which the jury was selected did not contain an African American prospective juror and the trial court erred by refusing to grant a change in venue; (3) the defendant was denied due process of law because Illinois Supreme Court Rule 431(b) is facially unconstitutional; (4) trial counsel provided ineffective assistance where he failed to object to testimony related to the defendant's knowledge of the victim's pregnancy; (5) the State failed to prove beyond a reasonable doubt that the defendant caused the death of the

15

victim's unborn child; and (6) the trial court erred by imposing a mandatory natural life sentence for first degree murder and intentional homicide of an unborn child.

¶ 47                                A. Right to Self-Representation

¶ 48     We first consider the defendant's claim that the trial court denied the defendant his right to self-representation. The defendant argues that he requested that the trial court allow him to represent himself during the hearing on January 17, 2017, and the court failed to admonish him under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) and grant his waiver of counsel.

¶ 49     The defendant did not raise an issue with regard to his denial of his right to self-representation in his motion for a new trial. Failure to specify grounds in writing in a motion for a new trial has been held to be a forfeiture of the issue on review in the absence of plain error. *People v. Albea*, 2017 IL App (2d) 150598, ¶ 16. A forfeited claim of error is reviewable under the plain error rule where the error is clear or obvious and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Albea*, 2017 IL App (2d) 150598, ¶ 17. The denial of self-representation is reviewable under the plain error rule because it involves structural error which affects the entire trial and requires automatic reversal. *Albea*, 2017 IL App (2d) 150598, ¶ 28. The State concedes that a denial of the right of self-representation is reviewable under the second prong of the plain error rule. The State claims, however, that the defendant has not shown clear or obvious error because the defendant did not make a clear and unequivocal request for self-representation.

16

¶ 50                        1. Clear and Unequivocal Request

¶ 51    The sixth amendment right to counsel implicitly provides for the right of self-representation in criminal proceedings. *Faretta v. California*, 422 U.S. 806, 821 (1975). The Illinois Constitution also guarantees an accused this right. *People v. Leeper*, 317 Ill. App. 3d 475, 480 (2000).

¶ 52    For the defendant to invoke the right of self-representation, he must clearly and unequivocally inform the trial judge that he has elected to represent himself. *People v. Burton*, 184 Ill. 2d 1, 21 (1998). Once the trial court has addressed a defendant who wishes to proceed *pro se* in open court, has appropriately informed him of the rights he is waiving, has informed him of the potential disadvantages of his action, and finds that the defendant is knowingly waiving his right to counsel, the court should make its findings accordingly and respect the defendant's decision to exercise his constitutional right of self-representation. *People v. Ward*, 208 Ill. App. 3d 1073, 1084-85 (1991).

¶ 53    The trial court may deny a defendant's request to proceed *pro se* where the timing of a request would be disruptive of the orderly scheduled proceedings, where a defendant is engaging in serious and obstructionist misconduct, and where the defendant is unable to make a knowing and intelligent waiver despite the court's efforts to explain the consequences of waiver. *Ward*, 208 Ill. App. 3d at 1084.

¶ 54    The trial court may consider whether a defendant acquiesced to be represented by counsel by vacillating on a request to proceed *pro se*. *Burton*, 184 Ill. 2d at 23. Likewise, a trial court may find that the defendant's conduct clearly established that he abandoned his request. *People v. Span*, 2011 IL App (1st) 083037, ¶ 66.

¶ 55    The trial court's denial of the defendant's election to represent himself is reviewed for an abuse of discretion by the trial court. *People v. Baez*, 241 Ill. 2d 44, 106 (2011). "An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Baez*, 241 Ill. 2d at 106. A trial court may also abuse its discretion where "it fails to understand it has discretion to act or wholly fails to exercise its discretion." (Internal quotation marks omitted.) *People v. Luellen*, 2019 IL App (1st) 172019, ¶ 38.

¶ 56    Here, the defendant elected to proceed *pro se* during his motion to "withdraw counsel" heard on January 17, 2017. The defendant stated, "I'll represent myself," six times during the motion hearing, after the trial court refused to remove Rowland as the defendant's attorney. The defendant's request to represent himself was clear.

¶ 57    The State claims that although the defendant's statement was "linguistically clear," the defendant's request was equivocal. The State argues that because the defendant made his request to represent himself after asking for new counsel to be appointed, and the defendant vacillated on his decision, then the defendant's request should be considered a "frustrated outburst." Therefore, he did not make an unequivocal request for self-representation. We disagree.

¶ 58    "A request for self-representation is not unclear or equivocal merely because it was a fallback to the defendant's first but unavailable choice of private counsel." *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 67. The defendant's request to remove counsel and to assign a new attorney does not make his request for self-representation equivocal merely because it was his second choice.

¶ 59    In *Rainey*, the court denied the defendant's third attempt at self-representation after the court granted his election to proceed *pro se* and had reassigned an attorney at the defendant's

request. *Rainey*, 2019 IL App (1st) 160187. A defendant has the right to change his mind more than once regarding the right to choose between counsel and self-representation. *Rainey*, 2019 IL App (1st) 160187, ¶ 49. The trial court may find that a request for self-representation is vacillating and abusive, and thus equivocal, where a defendant repeatedly changes his election as a tactical advantage. *Rainey*, 2019 IL App (1st) 160187, ¶ 50.

¶ 60    Here, the defendant was never *pro se* during the proceedings. He did not vacillate between being represented, and being *pro se*. The defendant had concerns with his initial attorney, Tison, and stated that he was willing to proceed *pro se*, if that was his only option. The court gave the defendant the option of appointing new counsel after Tison withdrew and the defendant chose to be represented. After interacting with Rowland, the defendant indicated that he did not want Rowland as his attorney. He wrote a motion for the court. At the hearing on January 17, 2017, the defendant clearly invoked his right to self-representation after the court indicated it was not going to allow Rowland to withdraw and appoint a new public defender.

¶ 61    The timing of the defendant's request is also an important factor to consider. If the defendant changes his mind on self-representation, a trial court should consider when the defendant made his request and grant a request that does not delay the trial or seriously impact the timing of the case. *Rainey*, 2019 IL App (1st) 160187, ¶ 63. The defendant's request, approximately two years prior to the trial date, did not have any notable impact on the timing of the trial in this case, where the trial had not yet been scheduled when the defendant made his preference known to the trial court.

¶ 62    We turn then to the State's characterization that the defendant made a "frustrated outburst" and not an unequivocal request for self-representation. During the January 17, 2017, hearing, the court either misspoke or changed its mind when it initially granted the defendant's motion to

19

remove Rowland as counsel. The defendant likely believed he would be representing himself after the court declined to appoint another attorney. Rowland was also confused by the court's statements and inquired whether he was still appointed as defendant's counsel. After the court stated that Rowland would not be allowed to withdraw as defendant's attorney, the parties discussed scheduling the next hearing. The defendant questioned the court about why his motion was denied. The court stated that Rowland provided competent representation and that the defendant did not get to "pick a lawyer." The defendant interjected with his election to represent himself.

¶ 63    We note that a defendant's lack of civility and decorum is a valid basis for denying a request for self-representation. *Rainey*, 2019 IL App (1st) 160187, ¶ 74. However, such misconduct must be "so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Rainey*, 2019 IL App (1st) 160187, ¶ 75. Although the defendant interrupted the trial court, his election to represent himself should not have been disregarded. The defendant articulated six times that he would represent himself when the trial court refused to remove Rowland as his attorney. The request was clear and unequivocal and there is no indication in the record that the defendant was being disruptive of the proceedings.

¶ 64                    2. Abandonment of Request for Self-Representation

¶ 65    The State claims that the trial court never denied a motion for the defendant to represent himself. Rather, the State urges that the defendant had abandoned his request to proceed *pro se*. We disagree. Where a defendant has invoked his right to self-representation, he is not required to continually renew the request once it is conclusively denied or required to "make fruitless motions." (Internal quotation marks omitted.) *Orazio v. Dugger*, 876 F.2d 1508, 1512 (11th Cir. 1989).

20

¶ 66     The purpose of the court setting on January 17, 2017, was to address the defendant's motion for his counsel to be removed. The defendant's written motion only requested that his motion be granted. During the proceeding, the defendant requested that another attorney be appointed. When that request was denied, the defendant made an alternate request to proceed *pro se*. The defendant's motion was ultimately denied, and Rowland remained as the defendant's counsel where the court disregarded the defendant's request to represent himself.

¶ 67     In *People v. Fisher*, the defendant appeared to acquiesce that he was not qualified to represent himself where he responded to the trial court's remarks with a series of "okays." *People v. Fisher*, 407 Ill. App. 3d 585, 590 (2011). The defendant argued, however, that nothing he said could be interpreted as a withdrawal of his request for self-representation. *Fisher*, 407 Ill. App. 3d at 590. Under these circumstances, *Fisher* advised that, "[b]ecause a denial of the right of self-representation would have been a structural error, automatically requiring reversal [citations], the court should have gone further by asking defendant outright if he still wanted to represent himself—thereby making it defendant's choice rather than the court's." *Fisher*, 407 Ill. App. 3d at 591.

¶ 68     In this matter, the defendant repeatedly requested to represent himself, stating, "I'll represent myself. I'm not taking Nathan Rowland as a lawyer." The court responded, "Well, we will deal with that at the next hearing." The defendant responded, "Okay." As in *Fisher*, the defendant said nothing that could be interpreted as a withdrawal of his request to represent himself. The defendant expressed discontent with his attorney during the following two hearings; and, prior to the trial date, the defendant wrote a letter to the court stating that the trial court forced him to go to trial with Rowland.

¶ 69    The court should have addressed the defendant's request to represent himself by providing the defendant with the admonishments required under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). Doing so would have allowed the court to determine whether the defendant was able to make a knowing and intelligent waiver of his right to counsel. The trial court abused its discretion by disregarding the defendant's election to represent himself.

¶ 70    Having found clear error and determining that the denial of self-representation involved a structural error which affected the entire trial, reversal of the conviction is required and remand for a new trial is necessary. We note that the record contains sufficient evidence from which the jury could have found that the defendant was guilty of first degree murder and intentional homicide of an unborn child, beyond a reasonable doubt. A retrial will not violate defendant's right to be free from double jeopardy. *Albea*, 2017 IL App (2d) 150598, ¶ 30.

¶ 71                                B. Change in Venue

¶ 72    We will briefly discuss the defendant's claim regarding the denial of his motion for a change of venue, as that issue is likely to arise on retrial. The defendant claims that his right to a fair trial was violated where the venire from which the jury was selected did not contain a prospective juror who was of African American descent. He claims that the trial court erred by refusing to grant a change in venue. The denial of a change in venue will not be disturbed absent an abuse of discretion. *People v. Jones*, 83 Ill. App. 3d 168, 169 (1980).

¶ 73    Petit juries must be drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). In order to establish a *prima facie* violation of the fair-cross-section requirement, the defendant must show: (1) that the excluded group is a distinctive group in the community, (2) that the representation of the group in the venires is not fair and reasonable in relation to the number of such persons in the community of this group, and (3) that the

22

underrepresentation of the group is due to systematic exclusion in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

¶ 74    The trial court heard evidence from the jury commissioner regarding the jury selection process. Lane testified that each year the circuit clerk's office provides a list of people in Saline County based on driver's license information and voter registration. Each month, 300 names are drawn, at random, from the list. Lane had no control over the selection of potential jurors and did not exclude potential jurors based on race. The trial court found that the defendant failed to prove the second and third prongs of the *Duren* test after considering the testimony of the jury commissioner. The defendant on appeal does not argue that the trial court erred in its determination based on *Duren*. Rather, he argues that the court should have generally ordered a change of venue based on racial prejudice.

¶ 75    According to section 114-6(a) of the Code of Criminal Procedure of 1963, "[a] defendant may move the court for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice against him on the part of the inhabitants that he cannot receive a fair trial in such county." 725 ILCS 5/114-6(a) (West 2018). The defendant is entitled to a change of venue where there are reasonable grounds to believe that the prejudice alleged exists and there is a reasonable apprehension that the defendant cannot receive a fair and impartial trial. *People v. Gendron*, 41 Ill. 2d 351, 354 (1968). The defendant does not have the right to a trial in a county with a large number of people of the same race as the defendant based on demographics alone. *People v. Mack*, 107 Ill. App. 3d 164, 175 (1982).

¶ 76    The defendant conceded that *voir dire* did not reveal overt racial prejudice or sufficient bias to justify a change of venue and lacks support for his allegation of prejudice. The trial court did not abuse its discretion by denying the defendant's motion for change of venue.

23

¶ 77    In light of our decision to reverse the defendant's conviction and remand for a new trial, we do not need to consider the remaining issues raised by this appeal, as they will likely be resolved upon retrial. *People v. Hunt*, 2016 IL App (1st) 132979, ¶ 28.

¶ 78                                        III. CONCLUSION

¶ 79    For the reasons stated, we reverse the conviction, and the cause is remanded for a new trial.


¶ 80    Reversed and remanded.