NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241327-U

NO. 4-24-1327

IN THE APPELLATE COURT

FILED
August 28, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Peoria County |
| DARIEN D. DAVIS, | ) | No. 21CF677 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Kevin W. Lyons, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) This court declines to address the constitutionality of section 11-506(c)(3) of the Illinois Vehicle Code (625 ILCS 5/11-506(c)(3) (West 2020)) because there was sufficient evidence to sustain defendant's conviction under section 11-506(c)(1) of the Vehicle Code (*id.* § 11-506(c)(1)).

    (2) The State proved defendant guilty of aggravated street racing beyond a reasonable doubt.

    (3) The trial court did not violate defendant's constitutional rights when it denied his request to proceed *pro se* because defendant's request was not clear and unequivocal.

    (4) Defendant forfeited his contentions of error from his sentencing hearing by failing to raise them in a postsentencing motion.

    (5) Defendant's convictions for six counts of aggravated driving under the influence violate the one-act, one-crime doctrine.

¶ 2    Defendant, Darien D. Davis, appeals following his convictions for six counts of

aggravated driving under the influence (DUI) (625 ILCS 5/11-501(d)(2)(G) (West 2020)) and one

count of aggravated street racing (*id.* § 11-506(a), (d)(3)). On June 20, 2023, the trial court sentenced defendant to an aggregate 31 years' imprisonment. On appeal, defendant argues (1) the definition of street racing contained in section 11-506(c)(3) of the Illinois Vehicle Code (*id.* § 11-506(c)(3)) is unconstitutionally overbroad and vague, (2) the State failed to prove him guilty of aggravated street racing beyond a reasonable doubt, (3) the court violated his constitutional rights when it denied his request to proceed *pro se*, (4) his 31-year sentence is excessive, and (5) his convictions violate the one-act, one-crime doctrine. We affirm in part and vacate in part.

¶ 3                                              I. BACKGROUND

¶ 4            In October 2021, defendant was indicted by a grand jury with three counts of aggravated street racing (counts I through III) (*id.* § 11-506(a), (d)(3)) and one count of reckless homicide (count IV) (720 ILCS 5/9-3(a) (West 2020)). The charges stemmed from a two-vehicle crash on September 4, 2021. The State later obtained additional indictments for six counts of aggravated DUI (counts V through X) (625 ILCS 5/11-501(d)(2)(G) (West 2020)) related to the September 4 crash.

¶ 5            Defendant hired private counsel, Jennifer Patton, to represent him. Although defendant was represented by counsel, defendant filed multiple handwritten motions throughout the pendency of his case. Each motion began with language indicating it was filed "through his attorney, Jennifer Patton." In March 2023, Patton filed a motion to withdraw as counsel.

¶ 6            On April 26, 2023, the trial court held a hearing on Patton's motion to withdraw. Patton explained there was a breakdown in communication because defendant "doesn't think [she] know[s] what [she's] talking about ***. And [they] talk round and round about the same thing for almost an entire conversation." Additionally, defendant filed a complaint with the Attorney Registration and Disciplinary Commission, alleging Patton was ineffective. After Patton provided

her rationale for the motion to withdraw, defendant voiced his concerns about Patton's representation; namely, she refused to file or adopt any of his motions. The court then had the following discussion with defendant:

"THE COURT: And what's your substitute? Who are you going to have as your lawyer?

THE DEFENDANT: You all appoint me a Public Defender.

THE COURT: I'm not doing that.

THE DEFENDANT: Then that mean I be [*sic*] going *pro se*.

THE COURT: I guess that's what it means.

THE DEFENDANT: Then if that's the case, then I—that's a breach of contract. She's withdrawing from me. I didn't fire her. She is withdrawing—

THE COURT: Okay. She's still on your case. See you at your court date.

THE DEFENDANT: She's withdrawing. She needs to pay my money back.

THE COURT: Goodbye. She's still in your—she's still your lawyer. See you when you're back. Motion denied."

The hearing concluded immediately after this exchange.

¶ 7        Following the trial court's denial of Patton's motion to withdraw, defendant filed a "complaint for breach of contract," alleging Patton "breached her fiduciary duty to represent [defendant]" by filing the motion to withdraw as counsel. At defendant's next court appearance, on May 8, 2023, the court inquired about the document. Defendant responded it was "a conflict of interest" for Patton to represent him after filing her motion to withdraw. Defendant also reiterated Patton refused to adopt any of the motions he filed. The court informed defendant it was not a

conflict for Patton to continue to represent him, and it did not "find any issue with [defendant] and [Patton] with this case."

¶ 8                                    A. Jury Trial

¶ 9            Defendant's jury trial occurred over two days in May 2023. Prior to jury selection, the trial court readmonished defendant on the charges and possible penalties. After the court's admonishment, defendant inquired about *People v. Martin*, 2011 IL 109102, and its impact on the aggravated DUI charges and sentencing. The court and defendant briefly discussed *Martin* and strict liability. After this discussion, the parties proceeded with jury selection.

¶ 10                          1. *Testimony of Adrian Kennedy*

¶ 11            On September 4, 2021, around 11 p.m., Adrian Kennedy was driving near the intersection of Reservoir Boulevard and Sterling Avenue when he observed "cars coming through the intersection *** moving in and out of traffic fast." Kennedy was worried about the safety of the children in his car, so he attempted to merge into a different lane. While he was merging, he "heard a loud explosion." He pulled into a parking lot and saw a woman "laying in the street" after being thrown through the windshield of a car. Kennedy waited for the police to arrive and spoke to them about what he observed.

¶ 12            On cross-examination, Kennedy acknowledged "cars go fast a lot on Sterling [Avenue]." When asked if he saw the two cars he observed going fast "in [his] rearview mirror," Kennedy explained the cars were traveling in the opposite direction as him. Kennedy also clarified he did not see the crash, he just "heard a car hit, and *** heard the tires, then *** a loud explosion." Afterwards, when he looked to his left, he saw the woman lying lifeless in the street.

¶ 13                          2. *Testimony of Rick Huett*

¶ 14            When Rick Huett exited his business, located on Sterling Avenue, at around 11 p.m.

- 4 -

on September 4, 2021, he heard "a loud engine noise" and saw "two cars rapidly approaching." Huett was familiar with the normal speed of traffic on Sterling Avenue, and the two cars he saw were "exceeding the speed limit." After the cars passed, he looked in the direction the cars went and "heard a loud bang," so he walked toward the noise.

¶ 15        Huett confirmed his business had surveillance cameras, which captured the two cars he saw on September 4. A copy of the video was admitted as part of State's exhibit No. 1 without objection and played for the jury. (We note there were five surveillance videos and two body worn camera videos admitted as part of State's exhibit No. 1. For clarity, we refer to each by its title, rather than State's exhibit No. 1.) In the Huett office video, as Huett places items in his car, two cars drive by, side-by-side. The car in the farthest lane from Huett is dark-colored and the other is white. Once the cars exit the frame, Huett turns to look in the direction the cars drove.

¶ 16        On cross-examination, Huett clarified he did not see the crash; he only heard the impact. Additionally, Huett did not see the victims' car before the crash. Huett did not recall telling officers he estimated the speed of the two cars he saw to be about 60 miles per hour.

¶ 17                        3. *Testimony of Kendra Donnell*

¶ 18        On September 4, 2021, Kendra Donnell was a passenger in a Mitsubishi Mirage driven by Debbie Smith. That night, Smith, Donnell, and Jackie McDuffie were going to Smith's house. According to Donnell, Smith was driving north on Gale Avenue and stopped at a red light. When the light turned green, Smith proceeded into the intersection. Donnell "[did not] remember the impact of the accident" but found out later, while at the hospital, she had been involved in a crash. As a result of the crash, Donnell suffered fractured T3, T4, and L1 vertebrae in her spinal column and required a permanent rod inserted into her hip. (We note the record indicates Donnell

- 5 -

fractured her spinal cord, however, fractured vertebrae in her spinal column would be the correct medical terminology.)

¶ 19  On cross-examination, Donnell reiterated the last thing she remembered from September 4 was when Smith turned onto Gale Avenue. She did not remember Smith turning onto Sterling Avenue or speaking to the police.

¶ 20  4. *Testimony of Paul Kuhn*

¶ 21  Trooper Paul Kuhn worked as a traffic crash reconstruction specialist for the Illinois State Police. After Kuhn's testimony about his training and education, the State tendered Kuhn as an expert in the field of traffic crash reconstruction without objection.

¶ 22  In the fall of 2021, Kuhn assisted Officer Jared Moore from the Peoria Police Department with collecting data from the airbag control module in a Mitsubishi Mirage. According to Kuhn,

> "[t]he airbag control module is a sensing device that collects particular data regarding the speed of the vehicle, the [revolutions per minute] of the vehicle, if any brakes were being used—or if the brake pedal was being pressed at that time. Some may contain steering inputs. May contain seat belt use."

Depending on the factory programming, a vehicle's airbag control module "can record anywhere from up to two-and-a-half seconds of data all the way up to *** almost nine minutes' worth of data" prior to a crash. Kuhn utilized a Bosch crash data retrieval tool to download the data from the Mitsubishi Mirage's airbag control module. After downloading the data, he provided the report to Officer Moore.

¶ 23    On cross-examination, Kuhn explained the Bosch crash data retrieval tool downloads the data from an airbag control module into a "propriety report," which is what he provided to Officer Moore.

¶ 24                    5. *Testimony of Moore*

¶ 25    Moore, a police officer with the Peoria Police Department, worked in the traffic investigation division. As part of his duties, Moore performed traffic enforcement and investigated traffic crashes. He received specialized training, including attending a nine-week traffic reconstruction course, along with various other courses.

¶ 26    On September 4, 2021, shortly after 11 p.m., Moore was dispatched to a traffic crash near the intersection of Sterling Avenue and Gale Avenue. Moore identified the two vehicles involved in the crash as a 2018 Mitsubishi Mirage and a 2008 BMW 750. Moore observed the Mitsubishi in the southbound lane of Sterling Avenue, facing northwest, and the BMW in the northbound lane of Sterling Avenue, facing north.

¶ 27    As Moore approached the Mitsubishi, he observed Smith in the driver's seat, Donnell in the front passenger's seat, and McDuffie lying in the road near the vehicle. He then walked over and spoke with the driver of the BMW, whom he identified as defendant. A portion of the video from Moore's body-worn camera was admitted as part of State's exhibit No. 1 without objection and played for the jury. In Moore's body-worn camera video, defendant tells Moore he was driving on Sterling Avenue and "when [he] got to the light, [the Mitsubishi] cut right in front of [him] and [he] couldn't stop fast enough." Defendant insisted he was not speeding at the time of the crash. According to Moore, the speed limit on Sterling Avenue is 45 miles per hour.

¶ 28    After the scene was cleared, Moore "beg[an] to inspect the scene with an eye toward accident reconstruction." Based on his training and experience, Moore determined that prior to the

crash, the BMW was traveling northbound on Sterling Avenue and the Mitsubishi was traveling northwest on Gale Avenue. When the Mitsubishi turned right onto Sterling Avenue, it was struck by the BMW. The BMW had damage to its front bumper's grille and hood area. There was also a red paint transfer on the center portion of the BMW's bumper's grille, which Moore determined was from the Mitsubishi's rear license plate. When Moore looked inside the BMW, he noticed the speedometer showed 86 miles per hour and the tachometer showed 3,900 revolutions per minute. Moore also observed two dark skid marks in the northbound lane of Sterling Avenue caused by the BMW's tires. After examining the skid marks, Moore determined the BMW's anti-lock braking system (ABS) did not activate prior to the crash, causing the brakes to lock up. However, when Moore examined the BMW, he was unable to determine why the ABS did not activate prior to the crash. Moore also examined the Mitsubishi and removed the airbag control module. He provided the Mitsubishi's airbag control module to Trooper Kuhn and later received the data from the module. Photographs of the BMW, Mitsubishi, and the skid marks were admitted without objection and published to the jury.

¶ 29        Moore also collected surveillance videos from businesses located around the area where the crash occurred. As discussed above, the videos Moore collected were admitted as a group as part of State's exhibit No. 1 without objection and played for the jury. The Sterling Plaza B video depicts the impact between the BMW and the Mitsubishi. Although a tree partially obstructs the view of the intersection, the BMW can be observed crashing into the rear of the Mitsubishi as the Mitsubishi drives north on Sterling Avenue. The Sterling Plaza A video "shows the post-impact collision between the BMW and Mitsubishi." In the video, sparks fly off the roadway as the Mitsubishi spins multiple times after being struck by the BMW. The BMW slows down and stops out of frame. Additionally, a white car can be seen driving behind the BMW before

passing it and driving out of frame. According to Moore, this white car is the same car depicted on the video from Huett's building. The Holy Family video does not capture the crash; however, in the audio, there is the sound of screeching tires, a crash, and then an engine accelerating. According to Moore, the accelerating sound came from the white car's engine as it fled the scene.

¶ 30　　　　　On October 27, 2021, Moore and Officer Donald Buhl performed skid tests on the roadway to "determine the drag factor of the roadway, which is how much grip you are getting off that pavement" when a vehicle applies its brakes. To prepare for the skid test, they obtained a police vehicle, deactivated the ABS, and installed an accelerometer. According to Moore, the accelerometer "give[s] you information as far as how quickly a vehicle stops from the speed it was going to zero." Moore and Buhl then drove the police vehicle "on the same section of roadway *** at a constant speed, [and] appl[ied] full brakes which cause[d] the tires to lock up and slide."

¶ 31　　　　　On cross-examination, Moore acknowledged he did not know whether the BMW's speedometer was functioning properly at the time of the accident. Additionally, he agreed if the BMW's speedometer was not functioning properly, the speedometer being frozen at 87 miles per hour "would mean nothing." Moore agreed there was no requirement for the white car to remain at the scene because it was not involved in the accident. The police were never able to identify the white vehicle or its driver.

¶ 32　　　　　　　　　　　　　　6. *Testimony of Buhl*

¶ 33　　　　　Buhl, a police officer in the traffic unit of the Peoria Police Department, assisted Officer Moore in investigating the September 4, 2021, crash that occurred on Sterling Avenue. As part of his training to be a member of the traffic unit, Buhl attended crash reconstruction school and numerous other classes. He has also been certified as an accident reconstructionist. Buhl utilized all the data collected after the accident, including the measurements from the skid marks,

- 9 -

the drag factor, data from the Mitsubishi's airbag control module, and the information about the BMW's ABS malfunctioning to quantify the vehicles' speeds at the time of the crash. Based on this data, Buhl estimated the BMW was traveling between 127 and 131 miles per hour when it applied its brakes prior to the crash. The BMW then "struck the Mitsubishi going 77 to 80 miles per hour." At the time of the crash, the Mitsubishi was driving 18 miles per hour.

¶ 34　　　　　On cross-examination, Buhl reiterated the Mitsubishi was driving 18 miles per hour when the BMW struck it. Buhl acknowledged the speed limit on Sterling Avenue is 45 miles per hour.

¶ 35　　　　　　　　　　　　7. *Testimony of Moriah Blain*

¶ 36　　　　　Moriah Blain, a patrol officer for the Peoria Police Department, was present at OSF Saint Francis Medical Center (OSF Hospital) on September 5, 2021, when defendant received treatment for the injuries he sustained in the crash. While defendant was at the hospital, one of the nurses completed a DUI evidence collection kit, which included "the collection of blood and urine from the defendant." Blain's body-worn camera was running the entire time and captured the completion of the DUI evidence collection kit. Relevant portions of the video from her body-worn camera were admitted without objection and played for the jury.

¶ 37　　　　　On cross-examination, Blain confirmed she was present the entire time defendant was at the hospital. Further, Blain observed defendant had a laceration to his lip, which was bleeding. Blain acknowledged one of the nurses applied "ointment" to defendant's lip. However, she did not remember if it was lidocaine or if it was applied prior to the completion of the DUI evidence collection kit.

¶ 38　　　　　　　　　　　　8. *Testimony of Dareea Paiva*

¶ 39        Dareea Paiva worked as a toxicologist at the Illinois State Police Forensic Science Laboratory in Springfield, Illinois. After Paiva testified about her education and training, she was tendered as an expert in the field of toxicology without objection. As a toxicologist, Paiva "analyze[s] blood and other body fluids for the presence of alcohol and drugs." Paiva received a DUI kit, sent through UPS, from the Peoria Police Department. The kit contained two tubes of blood and two bottles of urine, which Paiva tested for the presence of alcohol and drugs. The urine tested positive for "an amphetamine type drug, a cocaine type drug, and benzodiazepine type drugs." After receiving these results, Paiva conducted additional testing, which confirmed the urine contained amphetamine, a cocaine metabolite, and two types of benzodiazepines: nordiazepam and oxazepam. All the drugs found in the urine were controlled substances. According to Paiva, none of the drugs found in the urine were lidocaine. Moreover, lidocaine would not interfere with the testing for any of the drugs reported.

¶ 40        On cross-examination, Paiva testified there were no over-the-counter drugs that included amphetamines. Paiva acknowledged cocaine, not a cocaine metabolite, was a controlled substance. When asked if any of the drugs located in the urine were also present in the blood, Paiva stated she did not analyze the blood for drugs. Paiva agreed there was no way to determine when exactly the drugs were used. She was only able to tell it was within 36 to 48 hours of the urine collection. However, if she had tested the blood, she "would be able to give *** a smaller time frame."

¶ 41                    9. *Testimony of Jamie Harwood*

¶ 42        Jamie Harwood worked as the Peoria County coroner. As coroner, his "job is to determine manner and cause of death." Harwood worked on an investigation into the death of Jennifer McDuffie. As part of his work on the case, Harwood reviewed the police reports and

- 11 -

McDuffie's medical records. As a result of the crash, McDuffie suffered a traumatic brain injury, multiple fractures, lacerations to her kidneys and liver, and an aortic rupture. McDuffie died as a result of these injuries on September 25, 2021, at OSF Hospital. According to Harwood, McDuffie's death was caused by the crash on September 4, 2021.

¶ 43　　　On cross-examination, Harwood acknowledged he did not perform an autopsy on McDuffie but insisted it was not necessary to determine her manner and cause of death because he had her medical records.

¶ 44　　　　　　　　10. *Testimony of Charles Hanley*

¶ 45　　　Charles Hanley worked as the Tazewell County coroner. As part of his work as coroner, Hanley determined the manner and cause of death for Debra Smith. Prior to making his determination on Smith's cause and manner of death, Hanley reviewed all Smith's medical records and the police reports from the September 4, 2021, crash. According to Hanley, after the crash, Smith was transported to OSF Hospital. Her injuries from the crash included multiple rib fractures, a lung contusion, and air around her lungs. Smith was stable at first, despite her injuries, but she developed acute respiratory failure. Because of the respiratory failure, Smith was placed on a ventilator and required a feeding tube. She required these devices until she died on September 20, 2022. According to Hanley, the injuries Smith sustained in the September 4, 2021, crash caused her death.

¶ 46　　　On cross-examination, Hanley admitted he did not perform an autopsy on Smith. Hanley testified he made the decision not to perform an autopsy after reviewing Smith's medical records.

¶ 47　　　　　　　　11. *Jury Instruction Conference*

¶ 48 At the jury instruction conference, the State proposed the following non-Illinois Pattern Jury Instruction (IPI) definition for street racing:

"Street racing means the operation of two or more vehicles from a point side by side at accelerating speeds in a competitive attempt to outdistance each other; or the use of one or more vehicles in an attempt to outgain or outdistance another vehicle."

The State also proposed the following non-IPI definition for aggravated street racing:

"A person commits the offense of Aggravated Street Racing when he engages in street racing on any street or highway of this State and he was involved in motor vehicle accident that resulted in great bodily harm to another, where the street racing was the proximate cause of the injury."

Defense counsel did not object to the non-IPI instructions or propose any modifications.

¶ 49 12. *Verdict*

¶ 50 Following deliberations, the jury found defendant guilty on all counts.

¶ 51 B. Motion for a New Trial

¶ 52 On June 12, 2023, defense counsel filed a motion for a new trial, which alleged the State failed to prove defendant guilty of "each and every count by proof beyond a reasonable doubt." After hearing arguments on the motion prior to the sentencing hearing, the trial court denied the motion.

¶ 53 C. Sentencing

¶ 54 The trial court held defendant's sentencing hearing on June 20, 2023. At the hearing, a presentence investigation report (PSI) prepared by the probation department was admitted into evidence. After the State corrected a minor typographical error, defense counsel

- 13 -

stated she did not have any additions or corrections to the report. (We note defense counsel did object to one of the letters attached to the report and the court indicated it would not consider the letter. Defense counsel made no other objections to the report.) Following the admission of the PSI, Donnell and Michelle Smith, the daughter of Debra Smith, presented victim impact statements. In her statement, Donnell detailed the physical, psychological, and financial impacts the crash had on her. She also discussed the trauma of losing two people close to her. Michelle discussed the loss of her mother and requested the court consider punishing defendant "to the fullest extent of the law." Iesha Smith, another daughter of Debra Smith, provided a written victim impact statement, which was attached to the PSI. Following the victim impact statements, the State did not present any evidence in aggravation and defendant did not present any evidence in mitigation.

¶ 55        Prior to arguments, the State had the following discussion with the trial court regarding which counts merged:

> "[THE STATE]: As you know, there's many many counts in this case, and I do believe that the reckless homicide count would merge into the aggravated DUI counts because it involves the death of the same people. I think that the three aggravated DUI counts as to Jacqueline McDuffie, I don't know what term I'd use but merge because it's the same offense just different controlled substances in his system. So there would be that count.
>
> Then there would be the aggravated DUI regarding the three substances that resulted in death to Debbie Smith. I believe those would merge. And so as far as that sentence, by statute, because two or more, because two or more people were killed as the result of the defendant's acts under the aggravated DUI statute the

- 14 -

defendant must receive a sentence of not less than 6 years, not more than 28 years. That must be served at 85 percent.

> I think that it's not, it's not two counts *per se*. Those counts would be concurrent under that statutory scheme of sentencing 6 to 28 years.

> THE COURT: Under that theory, the death, the three counts with regard to Jacqueline McDuffie and three counts with regard to Debbie Smith, whatever the sentence would be, would be in essence one sentence for the two because it extends to 28 years because there are two deaths?

> [THE STATE]: Correct. And that's by statute."

The State then requested the court consider "ordering the aggravated street racing sentence as to Kendra Donnell consecutive to the aggravated DUI sentence."

¶ 56    During its argument, the State emphasized defendant's reckless actions on the night of the crash and the tragedy he caused. The State also highlighted defendant's lengthy criminal history, which included multiple felony, misdemeanor, and traffic offenses. According to the State, defendant's behavior shows he "frankly doesn't care about the laws. It's all about him and his pleasure at that moment." The State requested the trial court impose a sentence near the maximum.

¶ 57    At the conclusion of the State's argument, the trial court had the following discussion with the State:

> "THE COURT: Okay. [State's Attorney], I can't let this go. I'm going to ask you because I know—I want [defense counsel] to address it, too, unless it's not germane to you. The defendant, the record indicates, had already been arrested and bonded out I think for a vehicular hijacking when this happened?

- 15 -

[THE STATE]: Yes. I forgot to mention that to you, [Y]our Honor. In his vehicular highjacking case, [Peoria County case No.] 21-CF-522, he was arrested on August 23, 2021. He posted bond on August 26, 2021. $7,500 cash.

THE COURT: So his bond must have been 75,000, 7500 to walk.

[THE STATE]: Um-hmm.

THE COURT: And so on August 23rd of 2021?

[THE STATE]: August 26th of 2021 he posted the bond. He was arrested on August 23rd.

THE COURT: He posted the bond of $7,500. He then was—he was arrested sometime after this event because I suppose there was blood analysis that had to be done. But the event itself, this event itself occurred—

[THE STATE]: September 5th.

THE COURT: —twelve days later?

[THE STATE]: Yes. September 5, 2021. He was released after one day in jail and then indicted October 19th.

As to that—the legislature has changed the statute so they're not mandatory consecutive should he be found guilty of the vehicular hijacking, but I do believe it is substantially aggravating. I wrote all this down. I forgot to say it. He had just been—now he's still innocent until proven guilty on that offense, but he certainly was under bail conditions for just the few days before he decided to get in the vehicle this evening and have the behavior that he did. So I do believe that is a substantial aggravating factor the Court should take into consideration.

\* \* \*

- 16 -

THE COURT: I think I informed the defendant that whenever there are two or more cases at the same time the State can elect which one they want to go on first. It doesn't have to go in the order they think it may have happened. It wasn't as though I could pretend I didn't notice. That on August 23rd the defendant was arrested or detained in some fashion for vehicular hijacking in this county. He posted a bond, cash bond of $7,500. Thirteen days later this happened."

Following this discussion, defense counsel presented her sentencing argument to the court.

¶ 58        In her argument, defense counsel asserted, although defendant was convicted of aggravated DUI, defendant's speed was the cause of the crash, not his intoxication. To support this contention, defense counsel noted defendant passed field sobriety tests after the crash. Defense counsel also emphasized defendant was remorseful and the skid marks at the scene demonstrated he tried to avoid the crash. Additionally, defendant asked about the people in Smith's car while he was at the hospital. According to defense counsel, defendant maintained he was not street racing, he was simply driving fast. He could not avoid the crash when Smith's car turned onto Sterling Avenue without yielding. When defense counsel argued defendant's children would lose their father while defendant was incarcerated, the trial court interrupted to inquire about defendant's relationship with his children. In response to the court's inquiry, defendant asserted that he saw three of his children daily when he got off work at F&W Lawn Care. The court expressed disbelief about defendant's statement and noted the employment verification from F&W Lawn Care stated defendant only worked for that company for five days. After the brief interruption, defense counsel concluded her argument by requesting the court sentence defendant "in the area of eight to ten years."

¶ 59    Following arguments, defendant made a statement in allocution. Defendant began by stating he did not believe he could be sentenced for a Class 2 aggravated DUI because he did not have any prior DUIs. In response to this assertion, the trial court asked, "So, under the olly olly oxen free, you get one free one and the second one is the big stuff or what?" Defendant continued his statement and cited *Martin*. According to defendant, the law required that he be sentenced in the same fashion as the defendant in *Martin*. Defendant then expressed confusion on how the coroners determined the causes of death without performing autopsies, to which the court responded, "Well, I think it's a 100 mile an hour crash to the back of their car was a little bit of a contributor." Defendant attempted to counter the court's statement by asserting he had a green light and said, "[T]his is a two-lane runway, and as I'm coming through this intersection—" The court then interrupted defendant again and said, "You made it a runway, but it was really a roadway." Despite the additional interruptions, defendant continued his statement and asserted Smith violated the rules of the road by merging into his lane, which caused the crash. Defendant then renewed his complaint about defense counsel not filing or adopting his motions. Following his statement in allocution, defendant asked to read a letter to Donnell and the other victims' families. In his letter, defendant expressed remorse and indicated the crash was "just an accident" and he never intended to hurt anyone. All defendant's statements at the sentencing hearing referred to the crash as "this situation" or "an accident." Additionally, defendant maintained the accident was not intentional.

¶ 60    After a brief recess, the trial court delivered its sentence. (Because defendant raised multiple issues regarding the court's statements while delivering the sentence, we find it important to include the entirety of the court's remarks.)

"I've considered the [PSI] and the evidence and arguments of the lawyers and statement of allocution of the defendant. I've considered the statutory matters in aggravation, mitigation, history and character of the defendant, and I've tried to give due regard to the circumstances and nature of the offense.

I make the following observations and findings in order: I'm a person of many words. I'm a lawyer. I was raised in this county. I probably overtalk sometimes, but I'll try to be brief this time. Not because it's unimportant but because there is a lot that this case impacts and covers, and it doesn't serve a purpose to make the balloon bigger. It's already at popping stage after that remarkable performance by the defendant just now.

So that I don't forget there is no one in this courtroom who is more familiar about *People vs. Martin* than me. Nobody. I ought to know. I charged it. I ought to know. It happened on Christmas Eve. I ought to know. It killed a mother and her daughter. And how that case was charged and went to court is something I watched with great detail. Nobody knows that case better than me. Nobody.

So if that's the case you're relying on, [defendant], you are on an inner tube in the ocean and it's going flat. Nobody knows that case better than me.

Then to say that the Rules of the Road somehow help you out here. Are you kidding me? How insulting can you be to this family? Driving a car, a BMW, not your own, after midnight, where were your kids then? At a hundred and something miles an hour. Skidding to a stop after 200 feet in an intersection. I don't know how many times you've been by it, but surely I've been by it 10,000 times in my life. To even begin to lean on the Rules of the Road, to even begin to say that somehow

a quirk of the law has put you where you are is so insulting. I can't even imagine how this surviving family stomachs it because the record will indicate that you turned around in your seat and read a prepared statement and said at the very end I'm sorry. I'm not even sure they heard that because it was so clouded, so swamped, so drowned out by your arrogance.

This is a rhetorical question because it doesn't require an answer and I don't want one, but who do you think you are? Allow me to tell you. You are not the creator of an accident. This was a crash. It was a collision. It was not an accident. And you caused it.

This was not a situation. This isn't Houston with a problem. This was a crime. And you committed it.

And then you sort of coddle yourself by saying I didn't intend to do this. Well, I would hope not because we'd be having an entirely different conversation here. We'd be talking about the balance of your life in addition to the end of these two folks that you killed.

Don't call it an accident and get by with it. Don't call it a situation and get by with it. Don't say that you didn't intend to do it, and, therefore, it's not that bad. If you want to look for something to show you what happened, sir, don't you look in the law. You look in the mirror. Outrageous.

Sending you to prison you said does not serve a good example. Oh, yes, it does. It serves the exact example that I intend for it to serve. And the legislature has done many things wrong just as I have and everyone else has in different measures, but over time they have crafted law the so that it addresses a case like this, because

there was a time when you could kill more than one person, but the law treated it as though there was a cap that somebody could get, a ceiling for just one person. You killed three little girls playing in a mud puddle by being [*sic*] DUI there was a time you could sentence for only one, as just one died.

But over time the legislature has crafted the law to bring in people like you. People that other people have to worry about. Just like Ms. Donnell said, I have to worry about my own kids. I go outside, or, they go outside. Like she hasn't got enough on her mind. Survivor of a car with three people in it. Two of them die. And here she is coming to tell the tale.

She has to say to herself, does Jackie and Debbie, who is gonna tell and talk for them? She came and did that. That's who did it.

Ms. Donnell that's who did it. She didn't have to, but she did it because you shouldn't get the benefit of not hearing from her. Shame on you, [defendant]. The things you say, imagine what the families of these two ladies must think and Ms. Donnell must think to hear you point your finger at your lawyer, point your finger at the law, point your finger at a case. My finger points to you. You did it. Nobody else.

I was going the speed limit. Yes. You sure were. And three times it too. Speed limit and three more times. Some of this captured on video. Security cameras of Holy Family.

The defendant, and the record should reflect, is living in a dream world. If he wants any Appellate Court, if he wants anyone to think that there was some other

forces at work and, well, maybe I did something. Little tiny thing. Maybe I was going too fast.

Let's spell it out, [defendant]. You were going 120 or a hundred and something miles an hour in a BMW you did not own, but apparently had access to after midnight on Sterling and Gale in the city of Peoria. And three people who were just trying to use the road got in your way. Holy cow. Then for you to think that you should have some mitigation, some leniency for your behavior based on what you said is stunning, stunning.

All right. The defendant had a trial. He was found guilty of every count. He has four children. Two by one mother. One by another mother. One by another mother.

I am totally unconvinced that he was in the daily lives of these children. Totally unconvinced by that. Totally unconvinced that he's in some way contributed to his financial welfare or even has financial welfare or theirs. Even on his own report he makes $300 in cash. You wouldn't want to pay any taxes on that. A month. Hard to find a job in the 21st century apparently.

But I want to say I don't know, [defendant], that you know who was in the other car or care really. I suppose you may not even care. [The State] called it the infamous white car. These crashes—and I've seen many of them—had several of them—usually occur spontaneously. Somebody revs their engine at the stoplight and off they go.

Maybe they glance over at each other. But all of a sudden they're Formula 1 racers. And I want to say that I don't know that you know. I don't know that you

know who that was, but somebody in this county does. Somebody in the sound of my immediate voice knows who was in the other car.

In a strange way they share your guilt even though I don't know their name. But they know their name. They know they were driving and without a doubt I'm certain that they know what happened.

And, if history is any clue, they probably circled back to see the shrapnel. Not out of a joy, but out of an, oh, my God. Look what I contributed to. Because I don't think this would have happened alone, [defendant].

I'm not quite sure what I make of whatever it is you're saying about whether you were racing or weren't or whatever. Two cars were racing after midnight on a very very popular, well-driven road, street in Peoria at an intersection of three and a half streets Gale, Molleck go across Gale, Sterling, and you picked it.

And I can't help but say that it's a terrible thing that Donnell, or, Kendra Donnell has to live the life that she does. I'm gonna bet that there have been times where she said I wish it had been me, but I'm glad it wasn't. I don't like that it was any of you. I don't make the weather. I just tell it.

But she had to watch the death of her friend and a friend, and, not only just the death of the incident, but had to languish and perish over a year. What a way to go. Yikes.

You want to look for somebody to blame, [defendant], table of one, no waiting, have a seat. It's all you.

As I've said before, I've considered the statutory matters in aggravation and mitigation, all the other things that go here. There are ten counts. As it pertains to

Counts 5, 6, and 7, aggravated DUI of Jacqueline McDuffie and as it pertains to Counts 8, 9, and 10, aggravated DUI of Debbie Smith, I hereby sentence the defendant *** at 85 percent to be served to a term in the Illinois Department of Corrections of 23 years.

Consecutive to that sentence and not concurrent to, in other words once one sentence is served, then the other gets served. On Count 3 as it pertains to Kendra Donnell for aggravated street racing I sentence the defendant *** to a term in the Illinois Department of Corrections of eight years. That's to be served at a day-for-day rate. And that it be served consecutive to and not concurrent to the 23 years in the others.

The 23 years in Counts 5, 6, and 7, and 8, 9, and 10 shall be served concurrent with each other. It's the intention of the Court that the 23 year—if I said 28, I meant 23. The 23-year sentence be applied to the Jacqueline McDuffie counts; a 23-year sentence be applied to the Debbie Smith counts and that they be served concurrent to one another. In other words a total of 23.

Added to that is the sentence on Count 3 to Kendra Donnell which I said was, Count 3, eight years. Eight years at the day-for-day rate.

With regard to Count 4, reckless homicide, that count will merge—I'll make a finding but not a judgment. That count should merge with the others.

In Counts 1 and 2, I would enter findings but not judgments. I believe that—that's what my intention is and allows for, provides for a 23-year sentence at the 85 percent rate followed by an eight-year sentence at the day-for-day rate.

"Somebody has to protect the public against you, [defendant]. You're not the worst criminal in the world, but you really did it to yourself this time. You killed two people who did nothing more than get in your way. My. My. My."

Following the court's remarks, defense counsel indicated defendant wished to file a direct appeal rather than a postsentencing motion. The court entered a written sentencing order, which stated, with respect to the merger of convictions: "Counts 5-7 merge and Counts 8-10 merge & conviction enters on those counts; Count 4 merges with Counts 5-10; Conviction enters on Count 3; No conviction enters on the remaining counts."

¶ 61        This appeal followed.

¶ 62                                    II. ANALYSIS

¶ 63        On appeal, defendant argues (1) the definition of street racing contained in section 11-506(c)(3) of the Vehicle Code (625 ILCS 5/11-506(c)(3) (West 2020)) is unconstitutionally overbroad and vague, (2) the State failed to prove him guilty of aggravated street racing beyond a reasonable doubt, (3) the trial court violated his constitutional rights by denying his request to proceed *pro se*, (4) his 31-year sentence is excessive, and (5) his convictions violate the one-act, one-crime doctrine.

¶ 64            A. Constitutionality of Section 11-506(c)(3) of the Vehicle Code

¶ 65        Defendant was convicted of aggravated street racing based on great bodily harm suffered by Donnell (*id.* § 11-506(a), (d)(3) (West 2020)). Aggravated street racing occurs when "[a] person, in committing [street racing] was involved in a motor vehicle crash that resulted in great bodily harm or permanent disability or disfigurement to another, where the violation was a proximate cause of the injury." *Id.* § 11-506(d)(3). Under section 11-506(c) of the Vehicle Code, street racing is defined as:

"(1) The operation of 2 or more vehicles from a point side by side at accelerating speeds in a competitive attempt to outdistance each other; or

(2) The operation of one or more vehicles over a common selected course, each starting at the same point, for the purpose of comparing the relative speeds or power of acceleration of such vehicle or vehicles within a certain distance or time limit; or

(3) The use of one or more vehicles in an attempt to outgain or outdistance another vehicle; or

(4) The use of one or more vehicles to prevent another vehicle from passing; or

(5) The use of one or more vehicles to arrive at a given destination ahead of another vehicle or vehicles; or

(6) The use of one or more vehicles to test the physical stamina or endurance of drivers over long-distance driving routes." *Id.* § 11-506(c).

Defendant contends the definition of street racing contained in subsection (c)(3) of the Vehicle Code (*id.* § 11-506(c)(3)) is facially unconstitutional because it is "overbroad and vague as written." He requests this court find that section of the statute unconstitutional and vacate his aggravated street racing conviction outright. See *In re N.G.*, 2018 IL 121939, ¶ 38 ("[A] conviction *** based on an unconstitutional law *** is not only erroneous but is illegal and void and cannot be the legal cause of punishment."). In response, the State asserts there is nothing in the record to indicate the jury found defendant guilty based on the definition of street racing found in subsection (c)(3). According to the State, it is "extremely likely" the jury found defendant guilty based on the definition of street racing contained in subsection (c)(1) of the Vehicle Code (625 ILCS 5/11-

506(c)(1) (West 2020)), and, thus, this court should decline to address defendant's constitutional argument.

¶ 66    It is a long-standing rule of our supreme court that "cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort. [Citation.] Consequently, courts must avoid reaching constitutional issues unless necessary to decide a case." *People v. Bass*, 2021 IL 125434, ¶ 30. In *People v. Relerford*, 2017 IL 121094, ¶ 78, our supreme court held the portions of the stalking and cyberstalking statutes that criminalize negligently "communicat[ing] to or about" a person, where the speaker knows or should know the communication would cause a reasonable person to suffer emotional distress, "violate the first amendment because they are overbroad in that they impermissibly infringe on the right to free speech." Despite this holding, the court analyzed whether the defendant's convictions could be sustained based on other prohibited conduct in the statute. *Id.* ¶ 65. Therefore, before addressing defendant's constitutional argument, we first analyze whether his conviction for aggravated street racing can be sustained based on other prohibited conduct in the statute.

¶ 67    In this case, the State proposed a jury instruction which contained definitions of street racing from both subsection (c)(1) and (c)(3). However, the jury instruction did not require the jury to identify which section of the Vehicle Code it found defendant violated. During the jury instruction conference, defendant was afforded the opportunity to object or propose modifications to this instruction, and he declined to do so. Defendant also does not challenge the jury instruction on appeal. Following defendant's jury trial, the jury found him guilty of three counts of aggravated street racing based on the instruction, which contained both definitions of street racing. Consequently, it is entirely plausible the jury found defendant guilty of violating subsection (c)(1), which defendant does not allege is unconstitutional. Moreover, as discussed below (*infra* ¶ 71),

- 27 -

we find the State presented sufficient evidence to prove defendant guilty of aggravated street racing, under the definition contained in subsection (c)(1), beyond a reasonable doubt. Therefore, because there is sufficient evidence to sustain defendant's conviction based on other prohibited conduct in the Vehicle Code, we decline to address defendant's constitutional argument subsection (c)(3) is overbroad and vague.

¶ 68                    B. Sufficiency of the Evidence

¶ 69          " 'A challenge to the sufficiency of the evidence in a criminal trial requires us to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' " *People v. Bonnette*, 2025 IL App (4th) 240827, ¶ 49 (quoting *People v. Gumila*, 2012 IL App (2d) 110761, ¶ 61). "This standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction." *People v. Ivanchuk*, 2025 IL App (4th) 241230, ¶ 78. "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 70          As stated *supra* ¶ 65, a defendant is guilty of aggravated street racing when he "in committing [street racing] was involved in a motor vehicle crash that resulted in great bodily harm or permanent disability or disfigurement to another, where the violation was a proximate cause of the injury." 625 ILCS 5/11-506(d)(3) (West 2020). The definition of street racing, under section 11-506(a)(1) of the Vehicle Code (*id.* § 11-506(a)(1)), is "[t]he operation of 2 or more vehicles from a point side by side at accelerating speeds in a competitive attempt to outdistance each other." In this case, defendant does not dispute the two factors required to find him guilty of aggravated street racing, rather than street racing, specifically, that the motor vehicle crash resulted in great

bodily harm to Donnell or that the crash was the proximate cause of Donnell's harm. Consequently, we solely address whether there was sufficient evidence to prove the elements of street racing beyond a reasonable doubt.

¶ 71    Defendant contends there was insufficient evidence to prove the elements of street racing beyond a reasonable doubt because the circumstantial evidence merely proved "[defendant] was speeding along Sterling Avenue and that a white car was also speeding in the same direction." Based on the evidence presented at trial, defendant's argument defies logic. Officer Buhl testified, based on his training and experience, defendant was driving between 127 and 131 miles per hour when he applied his brakes prior to the crash. Immediately prior to the crash, defendant's car was seen on the surveillance video from Huett's office building driving alongside a white car. This creates a reasonable inference the white car was also driving between 127 and 131 miles per hour, despite the posted speed limit of 45 miles per hour. Viewed in the light most favorable to the State, the jury could reasonably infer defendant and the driver of the white car were engaged in a competitive attempt to outdistance each other, as they were both driving down the same street, side-by-side, at more than three times the posted speed limit. See *People v. Slater*, 393 Ill. App. 3d 977, 982 (2009) ("[I]n determining a defendant's guilt, the trier of fact is entitled to draw reasonable inferences that flow from the evidence presented."). Consequently, we find there was sufficient evidence to prove defendant guilty of aggravated street racing beyond a reasonable doubt.

¶ 72                    C. Defendant's Request to Proceed *Pro Se*

¶ 73    The sixth amendment entitles a criminal defendant to counsel at all critical stages of the prosecution. See U.S. Const., amend. VI. However, a defendant may elect to waive his right to counsel and proceed *pro se*. *People v. Wright*, 2017 IL 119561, ¶ 39. Our supreme court "has

long recognized that the right to self-representation is 'as basic and fundamental as [the] right to be represented by counsel.' " *Id.* (quoting *People v. Nelson*, 47 Ill. 2d 570, 574 (1971)). When a defendant makes a request to proceed *pro se*, his request "must be clear and unequivocal, not ambiguous. [Citation]. A defendant waives his right to self-representation unless he 'articulately and unmistakably demands to proceed *pro se*.' " *People v. Baez*, 241 Ill. 2d 44, 116 (2011) (quoting *People v. Burton*, 184 Ill. 2d 1, 21 (1998)) We review a trial court's denial of a defendant's request to proceed *pro se* for an abuse of discretion. *People v. Maury*, 2025 IL App (4th) 220887, ¶ 117. "An abuse of discretion has occurred when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the position adopted by the trial court." *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 75.

¶ 74        In support of his argument, defendant cites the case of *People v. Black*, 2022 IL App (5th) 190386-U, as persuasive authority. However, we find *Black* distinguishable from this case. In *Black*, the Fifth District found the defendant made a clear and unequivocal request to proceed *pro se* during a motion to "withdraw counsel." *Id.* ¶ 56. At that hearing, "the defendant stated, 'I'll represent myself,' six times *** after the trial court refused to remove *** defendant's attorney." *Id.* In this case, defendant made a single statement, "Then that mean I be [*sic*] going *pro se*," after the trial court informed him it would not appoint a public defender if Patton were given leave to withdraw as counsel. Although defendant made this statement about "going *pro se*," when the court agreed, stating, "I guess that's what it means," defendant immediately equivocated and stated he was not firing Patton, but rather she was withdrawing from his case. After this equivocation, the court denied Patton's request to withdraw as counsel. Following the denial of Patton's request to withdraw, defendant never raised the issue of proceeding *pro se* at any time during the remainder of the proceedings. Consequently, we find this single statement, reviewed in

the context of the entire record, did not constitute a clear and unequivocal request to proceed *pro se*. Accordingly, we conclude the court did not abuse its discretion when it denied defendant's request.

¶ 75                                    D. Sentencing

¶ 76        Defendant argues his 31-year sentence was excessive because the trial court: (1) relied on information outside the record when fashioning his sentence, (2) displayed bias toward defendant, and (3) considered an improper aggravating factor. According to defendant, "Each of these errors contributed to an excessive sentence that unfairly reflects [the court]'s personal opinion of [defendant] and this type of offense." We find it important to note defendant lists each of these contentions of error under the umbrella of an excessive sentencing argument, which suggests only the cumulative effect of these contentions should be considered. Because of this, it is not clear whether defendant intended to raise each claim as an independent issue. Nonetheless, because defendant provided sufficient argument for each of his contentions of error and the State responded in turn, we will address each of the contentions of error raised as part of defendant's excessive sentencing argument as an independent issue and then consider any cumulative effect, if necessary.

¶ 77        Our supreme court has explained "the range of sentences permissible for a particular offense is set by statute. Within that statutory range, the trial court is charged with fashioning a sentence based upon the particular circumstances of the individual case, including the nature of the offense and the character of the defendant." *People v. Fern*, 189 Ill. 2d 48, 55 (1999). Moreover, " '[i]n determining the appropriate sentence, the trial judge must consider all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.' " (Emphasis omitted.) *People v. Brunner*,

2012 IL App (4th) 100708, ¶ 50 (quoting *People v. Ward*, 113 Ill. 2d 516, 527 (1986)). "A sentence within statutory limits will not be deemed excessive and an abuse of the court's discretion unless it is 'greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.' " *People v. Pina*, 2019 IL App (4th) 170614, ¶ 20 (quoting *Fern*, 189 Ill. 2d at 54).

¶ 78       Defendant acknowledges he forfeited his contentions of error by failing to raise the same in a postsentencing motion. *People v. Martin*, 119 Ill. 2d 453, 458 (1988). Nevertheless, defendant requests this court review his contentions of error pursuant to the plain-error doctrine. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under the plain-error doctrine, this court may review unpreserved issues on appeal when "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The first step in this analysis is to determine whether a clear or obvious error occurred. *Id.* Accordingly, we will first determine whether any of defendant's claims constitute a clear or obvious error.

¶ 79                    1. *Reliance on Information Outside the Record*

¶ 80       " '[T]he deliberations of the trial judge are limited to the exhibits offered and admitted in evidence and the record made before him in open court.' " *People v. Holland*, 2023 IL App (4th) 220384, ¶ 57 (quoting *People v. Rivers*, 410 Ill. 410, 416 (1951)). " 'A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law.' " *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001) (quoting *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962)). However, "[t]o be entitled to a remand for resentencing, a defendant who has alleged error must show more than the mere mentioning of the

improper factor in aggravation: the defendant bears the burden of showing that the trial judge relied upon the improper factor in fashioning the defendant's sentence." *People v. Brown*, 2019 IL App (5th) 160329, ¶ 18. "Whether the trial court relied on an improper factor during sentencing is a question of law reviewed *de novo*." *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 55.

¶ 81        Here, defendant argues the trial court improperly relied on its personal experience prosecuting *Martin* and its experience presiding over other street racing cases when fashioning his sentence.

¶ 82                                  a. *Martin*

¶ 83        During defendant's sentencing hearing, defendant raised and discussed *Martin*. Defendant attempted to argue he was being sentenced improperly based on the holding in *Martin*. (We also note he raised this same issue, citing the same case, before jury selection.) After this argument at sentencing by defendant, the trial court responded, stating:

> "So that I don't forget there is no one in this courtroom who is more familiar about *People v. Martin* than me. Nobody. I ought to know. I charged it. I ought to know. It happened on Christmas Eve. I ought to know. It killed a mother and her daughter. And how that case was charged and went to court is something I watched with great detail. Nobody knows that case better than me. Nobody.
>
> So if that's the case you're relying on, [defendant], you are on an inner tube in the ocean and it's going flat. Nobody knows that case better than me."

Defendant contends "[the court's] emotional reaction and recitation of *Martin*'s facts increased the risk that [it], even subconsciously, considered the undeniably devastating details of that case in fashioning [defendant]'s thirty-one-year sentence." We disagree. Although we do not condone these specific remarks about the court's involvement as the prosecutor in a case or the details of

the case, it is evident from the record the court was merely informing defendant that he knew the case well and that *Martin* had no impact on defendant's sentencing. See *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 31 ("In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." (Internal quotation marks omitted.)). Moreover, it was defendant who invited the discussion of the other case. After the brief mention of *Martin* at the beginning of its sentencing remarks, the court never discussed *Martin* again. There is no evidence in the record to support the contention that the court utilized its prior experience prosecuting *Martin* when fashioning defendant's sentence. Consequently, we cannot conclude a clear or obvious error occurred.

¶ 84                              b. Other Street Racing Cases

¶ 85          Similarly, we find the trial court's minor reference to how street races "usually occur" was a brief offhand comment and did not affect defendant's sentence. Our review of the record indicates the court was merely speculating as to how defendant's race with the white car began and whether defendant knew the driver in the white vehicle or if it was an unknown individual and the two strangers decided to engage in a street race. There is no evidence the court's speculation as to how the street race began affected the sentence it gave defendant. Moreover, after the reference, the court stated:

> "I'm not quite sure what I make of whatever it is you're saying about whether you were racing or weren't or whatever. Two cars were racing after midnight on a very very popular, well-driven road, street in Peoria at an intersection of three and a half streets Gale, Molleck go across Gale, Sterling, and you picked it."

This context makes it clear the court's reference was in response to defendant's contention he was not street racing when the crash occurred. Consequently, we conclude the court's comment did not amount to a consideration of an improper factor. Because no error occurred, we find the plain-error doctrine does not excuse defendant's forfeiture.

¶ 86                                    2. *Judicial Bias*

¶ 87           "A trial court must conduct itself in a fair and impartial manner, and the court may not show bias or prejudice against either party." *People v. Fisher*, 2023 IL App (4th) 220717, ¶ 30. "A trial judge is presumed to be impartial, and it is the burden of the party challenging the court's impartiality to overcome that presumption." *Id.* ¶ 31. "Allegations of judicial bias must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place." *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). To demonstrate bias, the defendant must " 'demonstrate that the judge displayed active personal animosity, hostility, ill will, or distrust toward the defendant.' " *Fisher*, 2023 IL App (4th) 220717, ¶ 31 (quoting *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96). "Whether the trial judge's conduct requires reversal is reviewed *de novo*." *Id.*

¶ 88           Defendant contends the trial court was biased against him at sentencing. According to defendant, at sentencing, the court (1) "improperly expressed [its] frustration with sentencing limitations in a previous version of the DUI statute and directed that hostility toward [defendant]," (2) "reprimanded [defendant] for exercising his constitutional right to the effective assistance of counsel," and (3) "judg[ed] [defendant]'s family structure, ridicule[ed] his income, and question[ed] his relationship with his children." After reviewing the record as a whole, including the arguments presented, defendant's statement in allocution, and the PSI, we find these comments,

when viewed within the context of the court's remarks, do not demonstrate the court was biased against defendant.

¶ 89            With respect to the comments regarding the sentencing limitations under the prior DUI statute, we agree with the State that this comment by the trial court was in relation to the deterrent effect defendant's sentence would have and a discussion of how defendant's sentence would protect the public. This is evidenced by other statements the court made directly before and after the statements about the legislative change, including: "Sending you to prison you said does not serve a good example. Oh, yes, it does" and "But over time the legislature has crafted the law to bring in people like you. People that other people have to worry about." These statements provide context to the court's remarks and make it clear the court was discussing the deterrent effect of defendant's sentence and why defendant's sentence was necessary to protect the public. See 730 ILCS 5/5-5-3.2(a) (West 2022).

¶ 90            Next, we disagree with defendant regarding the purpose behind the trial court's comments regarding defendant's allegations of ineffective assistance of counsel, particularly that counsel would not file his motions. Defendant contends the court reprimanded him for exercising his right to the effective assistance of counsel. However, a review of the record demonstrates the court was reprimanding defendant for his failure to take accountability for his actions. The court stated:

> "The things you say, imagine what the families of these two ladies must think and Ms. Donnell must think to hear you point your finger at your lawyer, point your finger at the law, point your finger at a case. My finger points to you. You did it. Nobody else."

There was no reprimand for defendant raising the issue of ineffective assistance of counsel. Rather, the reprimand by the trial court was for defendant's failure to accept responsibility for his actions. The court was within its discretion to take defendant's history, character, and attitude into account when sentencing him. See *People v. Clark*, 2023 IL 127273, ¶ 92.

¶ 91 Lastly, the trial court's comments regarding defendant's family structure, income, and relationship with his children were the court questioning defendant's credibility. Defendant claimed to have a good relationship with his children and informed the court he saw his children every day after work. However, the court noted this statement was false because defendant's employment verification showed defendant had only worked for five days. Moreover, the court's reference to defendant's family structure appeared to be in reference to the challenge of visiting children at multiple locations every day after work, given the children lived in Bloomington, Illinois, and Indiana, while defendant lived in Peoria. Additionally, defendant claimed to only make $300 a month, but during his PSI interview, he claimed he paid $450 a month for child support and was current on his payments. The court's statements were merely pointing out defendant's lies to the court regarding his income and relationship with his children. It weighs heavily on defendant's credibility if he was willing to lie directly to the court.

¶ 92 While this court does not condone any of the trial court's specific statements, in the context of the whole record, we conclude none of the statements made by the court during defendant's sentencing rise to the level of judicial bias. Consequently, we find no clear and obvious error occurred.

¶ 93 3. *Consideration of Improper Aggravating Factor*

¶ 94 "The trial court may not rely on bare arrests or pending charges in aggravation of a sentence." *People v. Minter*, 2015 IL App (1st) 120958, ¶ 148. However, "[a]n isolated remark

- 37 -

made in passing, even though improper, does not necessarily require that [a] defendant be resentenced." *People v. Fort*, 229 Ill. App. 3d 336, 340 (1992). "To be entitled to a remand for resentencing, a defendant who has alleged error must show more than the mere mentioning of the improper factor in aggravation: the defendant bears the burden of showing that the trial judge relied upon the improper factor in fashioning the defendant's sentence." *Brown*, 2019 IL App (5th) 160329, ¶ 18. "Whether the trial court relied upon an improper factor during sentencing is a question of law reviewed *de novo*." *Musgrave*, 2019 IL App (4th) 170106, ¶ 55.

¶ 95        Defendant argues the trial court improperly considered his pending vehicular hijacking case as a factor in aggravation at his sentencing. Moreover, defendant contends it is clear the vehicular hijacking case affected his sentence because the court brought up the pending case *sua sponte*. We disagree. A review of the record demonstrates the court inquired about the status of the pending vehicular hijacking case. (We note the vehicular hijacking case was listed in the PSI and the disposition stated, "This case remains pending.") All the follow-up questions by the court were about when defendant was placed on bond for that case and how many days had elapsed between defendant's release on bond and the crash. Based on the court's questioning, it is evident the court was more concerned with defendant's actions in committing aggravated street racing and aggravated DUI while on bond, rather than the fact defendant had another pending charge. This is analogous to the situation in *People v. English*, 2023 IL App (4th) 220296-U, ¶ 44, where this court determined the trial court "was clearly concerned with defendant's history of noncompliance with court proceedings, not his guilt with respect to other charges." In that case, we found this was a permissible consideration for the court at sentencing. Consequently, we find the court did not err in its discussion of defendant's pending vehicular hijacking case.

¶ 96                              4. *Excessive Sentence*

¶ 97          We find it important to note defendant's main contention of error was his sentence was excessive. However, given the issues defendant raised did not constitute clear or obvious errors, we must conclude no plain error occurred that would excuse defendant's forfeiture of his contention that his sentence was excessive. Additionally, as noted above, "[a] sentence within statutory limits will not be deemed excessive and an abuse of the court's discretion unless it is 'greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.' " *Pina*, 2019 IL App (4th) 170614, ¶ 20 (quoting *Fern*, 189 Ill. 2d at 54). Other than the errors defendant alleged above, he failed to argue the sentence imposed was at great variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. Defendant also does not assert his sentence was outside the statutory guidelines. Accordingly, we conclude the sentence imposed was not excessive.

¶ 98                          5. *Ineffective Assistance of Counsel*

¶ 99          A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14 (quoting *Strickland*, 466 U.S. at 688). Prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004). A defendant must satisfy both prongs of the *Strickland* standard, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. See *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010).

¶ 100    In this case, because we have concluded no error occurred at defendant's sentencing, defendant cannot establish the prejudice prong of ineffective assistance of counsel. See *People v. Jones*, 2020 IL App (4th) 190909, ¶ 179 ("Absent a clear or obvious error *** , neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from the forfeiture.").

¶ 101    E. One-Act, One-Crime Doctrine

¶ 102    Pursuant to the one-act, one-crime doctrine, "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *People v. Coats*, 2018 IL 121926, ¶ 11. Whether a violation of the one-act, one-crime doctrine has occurred is a question of law, which we review *de novo*. *Id.* ¶ 12. Although defendant failed to preserve this issue for review, our supreme court has held "forfeited one-act, one-crime arguments are properly reviewed under the second prong of the plain-error rule because they implicate the integrity of the judicial process." *People v. Nunez*, 236 Ill. 2d 488, 493 (2010).

¶ 103    In this case, defendant was found guilty of six counts of aggravated DUI (625 ILCS 5/11-501(d)(2)(G) (West 2020)) (counts V through X) and three counts of aggravated street racing (*id.* § 11-506(a), (d)(3)) (counts I through III). All the counts pertained to the crash on September 4, 2021. At sentencing, the trial court indicated it would merge counts V through VII, which alleged defendant committed the offense of aggravated DUI, causing the death of McDuffie. Similarly, the court indicated it would merge counts VIII through X, which alleged defendant committed the offense of aggravated DUI, causing the death of Smith. Counts V through VII and counts VIII through X alleged the same conduct, aggravated DUI involving death, but they named two different victims. However, although the court indicated the merger of these counts, its written sentencing order states, "Counts 5-7 merge and Counts 8-10 merge & conviction enters on those

counts; Count 4 merges with Counts 5-10; Conviction enters on Count 3; No conviction enters on the remaining counts." Based on the written sentencing order, the court entered convictions on all six counts of aggravated DUI but sentenced defendant to two concurrent sentences, one for each victim's death. The parties agree this was error pursuant to our supreme court's holding in *People v. Lavallier*, 187 Ill. 2d 464, 469 (1999) ("[T]he occurrence of injuries to more than one person *** does not transform a single act of [DUI] into a separate felony for each additional person injured."). We agree and vacate all but one of defendant's convictions and sentences for aggravated DUI.

¶ 104        Defendant also contends the trial court entered convictions on all three counts of aggravated street racing (counts I through III). However, the court indicated both in its oral ruling and on the written order that it would only enter judgment and conviction on count III for aggravated street racing and no convictions would enter on the remaining counts, which included the two other counts of aggravated street racing. Consequently, we need not vacate any of defendant's convictions for aggravated street racing.

¶ 105                                III. CONCLUSION

¶ 106        For the reasons stated, defendant's convictions and sentences for counts VI through IX are vacated. Defendant's convictions and sentences for count III, aggravated street racing (625 ILCS 5/11-506(a), (d)(3) (West 2020)), and count V, aggravated DUI (*id.* § 11-501(d)(2)(G)), are affirmed.

¶ 107        Affirmed in part and vacated in part.